EUSCO, INC., Plaintiff–Appellee,

v.

Joe HUDDLESTON, Commissioner of
Revenue, State of Tennessee,
Defendant–Appellant.

Supreme Court of Tennessee,
at Nashville.

June 8, 1992.

Charles W. Burson, Atty. Gen. & Reporter, Cynthia M. Odle, Asst. Atty. Gen., Nashville, for defendant-appellant.

Christopher M. Was, Trabue, Sturdivant & DeWitt, Nashville, for plaintiff-appellee.

## OPINION

ANDERSON, Justice.

At issue in this sales tax direct appeal is whether the taxpayer's sales of truck bodies to out-of-state utility companies constitute either "selling tangible personal property at retail in this state," or "installing of tangible personal property ... where a charge is made for such installation," so as to make the sales taxable under the Retailers' Sales Tax Act; or whether the sales fall within the exemption for "articles of tangible personal property imported into this state or produced or manufactured in this state for export." The Chancellor found that the transactions taxed by the Commissioner were exempt because the personal property was manufactured in this state for export. The Commissioner contends on appeal that the assessed transactions were sales at retail in this state, and that the transactions involved the installation, rather than manufacture, of tangible personal property. We disagree and affirm the trial court judgment for the reasons set out below.

## BACKGROUND

The taxpayer, Eusco, Inc., is a Tennessee corporation with its principal place of business in White House, Tennessee. At its White House facility, truck bodies and related components are constructed for electric and telephone utility trucks. In the course of building the truck bodies, Eusco uses components it fabricates, as well as components made by other manufacturers.

Generally, the trucks are built and sold by using one of two different methods. In some cases, a bare truck cab and chassis is purchased directly from the manufacturer, such as General Motors or Ford, on which Eusco then builds and attaches the truck body and related components. Once the process is complete, the entire utility truck is sold to a telephone or electric company.

In other cases, a bid is made upon a specified contract with a utility company. When Eusco is the successful bidder, the utility company purchases a bare truck cab and chassis from a manufacturer and causes it to be delivered by common carrier to the White House facility. Under the contract, the truck body and related components are then fabricated and attached according to the purchaser's specifications, and the completed truck is delivered to the utility company's place of business. This kind of transaction is referred to as a "drop shipment" sale.

On October 3, 1989, after being audited by the Tennessee Department of Revenue for the period of December 1985 through June 1989, Eusco was assessed a deficiency in sales taxes and interest of $202,182.00. The assessment at issue here is sales taxes and interest of $78,337.00 upon nine "drop shipment" sales to out-of-state customers.

The Commissioner taxed the "drop shipment" sales on the basis of Tenn.Code Ann. §§ 67–6–201(1) (1983 & 1989) and 67–6–202 (1983 & 1989), which levy a tax upon "the business of selling tangible personal property at retail in this state." In addition, the Commissioner taxed the "drop shipment" sales on the basis of Tenn.Code Ann. §§ 67–6–102(13)(F)(vi) (1983) and 67–6–102(22)(F)(vi) (1989), which provide that taxable retail sales shall include "[t]he installing of tangible personal property ... where a charge is made for such installation."

The taxpayer challenged the Commissioner's assessment on the grounds (1) that the sales were to out-of-state customers, and therefore, not sales at retail "in this state;" and (2) that it manufactured, rather than installed, the truck bodies for the out-of-state customers, and the sales were therefore exempt from taxation under Tenn.Code Ann. § 67–6–313(a) (1983 & 1989). Section 67–6–313(a) provides that taxable retail sales do not include "articles of tangible personal property imported into this state or produced or manufactured in this state for export."

The dispute between the taxpayer and the Commissioner relates to how the law should be applied to the facts, which are, for the most part, undisputed. At the trial, Donald Eden, Eusco's president, described the process by which Eusco modifies the utility trucks, which testimony is summarized below.

Each bare truck cab and chassis comes with an incomplete vehicle manual and other incomplete vehicle documents. The manual describes what must be done in order to complete the vehicle to make it road worthy under federal regulations, such as altering the braking system and building a truck body so that rear warning lights can be installed. According to Eden, something has to be done to every truck to make it road worthy because none of the vehicles comply with federal regulations when they are received from the manufacturer.

Before it starts building the truck bodies, Eusco drafts detailed plans of the project and sends them to the purchaser. The purchaser then reviews the plans and makes suggested changes. Once the plans are returned, Eusco begins building the body and orders any components it will need.

One of the major components which is ordered from another manufacturer is a hydraulic boom, which is used to employ aerial devices and digger derricks. However, with the exception of the hydraulics, the hydraulic boom, and a few valves, Eusco has the capacity to manufacture and fabricate every component that goes on a utility truck. Although it is more economical to buy some of the components from other manufacturers, the subframe and truck body are always made at the White House facility.

Once construction begins, it usually takes about one month to complete each truck. Before it can be delivered to the purchaser, however, a truck has to be vigorously tested to make sure it complies with the federal regulations. When the testing is complete, Eusco affixes a sticker to the door indicating that the vehicle has been tested and complies with federal safety standards. Only then are the trucks ready to be delivered to the purchaser.

With respect to the nine "drop shipment" sales at issue in this case, all of the trucks were delivered by a Eusco employee to the out-of-state purchasers. These deliveries were in conformity with Eusco's standard delivery terms of F.O.B. to the purchasers place of business. Eden testified that this was the method of delivery because every truck, and particularly those produced under a "drop shipment" contract, is different and a Eusco employee has to deliver the truck and spend a few days with the purchaser to demonstrate exactly how the truck operates.

After the truck is delivered, Eusco bills its customers by sending them an invoice in accordance with the original contract. The invoices are for one total amount because Eusco does not make a separate charge for labor, the components produced by Eusco, or the components purchased from other manufacturers.

The prices charged for the completed truck body and components in the nine "drop shipment" sales at issue in this case ranged from $42,000.00 to $57,000.00. These prices included Eusco's costs of purchasing hydraulic booms, which ranged from $20,000.00 to $35,000.00, but they did not include the customers' costs of purchasing bare truck cabs and chassis from the manufacturers, which ranged from $18,000.00 to $25,000.00.

Following the hearing, the Chancellor found that Eusco was a manufacturer of rear truck bodies. Accordingly, the Chancellor held that Eusco's sales to out-of-state customers were exempt under § 67–6–313(a) as property manufactured for export. The Chancellor ordered the assessment reduced by $78,337.00, and awarded Eusco's costs and attorneys' fees in accordance with Tenn.Code Ann. § 67–1–1803(d) (1983 & 1989).

## TAXABLE RETAIL SALES "IN THIS STATE"

■ The first issue we address is whether the plaintiff's sales to out-of-state customers were taxable as retail sales "in this state" under Tenn.Code Ann. § 67–6–201(1) (1983 & 1989) and § 67–6–202 (1983 & 1989). "The elements necessary to constitute a sale are (1) transfer of title or possession, or both of (2) tangible personal property, for a (3) consideration." *Hearthstone, Inc. v. Moyers,* 809 S.W.2d 888, 890 (Tenn.1991) (quoting *Volunteer Val–Pak v. Celauro,* 767 S.W.2d 635, 636 (Tenn.1989)). *See also* Tenn.Code Ann. §§ 67–6–102(23)(A) (1989) and 67–6–102(14)(A) (1983). Since it is clear that there was a transfer of tangible personal property for a consideration, we must determine whether the nine "drop shipment" sales involved a transfer of title or possession to the utility companies in Tennessee so as to make them taxable retail sales "in this state."

■ For Tennessee sales tax purposes, the place where title to tangible personal property is transferred to the buyer is determined under the applicable provisions of the Uniform Commercial Code. *See Illinois Cent. Gulf R.R. v. State,* 805 S.W.2d 746 (Tenn.1991); *Volunteer Val–Pak v. Celauro,* 767 S.W.2d 635 (Tenn.1989). The Uniform Commercial Code provides:

[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading ... if the contract requires delivery at a destination, title passes on tender there.

Tenn.Code Ann. § 47–2–401(2) (1979). In addition, the Code provides that:

[u]nless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which ... when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in this chapter (§ 47–2–503).

Tenn.Code Ann. § 47–2–319(1) (1979).

All of the "drop shipment" sales at issue in this case were F.O.B. to the utility companies' places of business, and there were no other agreements between Eusco and the utility companies as to when or where title to the truck bodies passed. Title to the truck bodies therefore passed to the utility companies when Eusco completed its performance by delivering the trucks out-of-state to their places of business.

■ The Commissioner, however, contends that the sales occurred in this state because title to the truck bodies produced by Eusco passed to the utility companies under the doctrine of accession. Under the doctrine of accession, an innocent trespasser can obtain title to property if he contributes labor and materials worth more than the property's original value and if due compensation is made to the original owner. *Capital Chevrolet Co. v. Earheart,* 627 S.W.2d 369, 371 (Tenn.App.1981). The Commissioner argues that title to the truck

bodies passed to the out-of-state utility companies in Tennessee under the doctrine of accession when Eusco attached the bodies and other components at its facility in White House.

The Commissioner has misinterpreted the doctrine of accession and its application to this case. Eusco's relationship with its utility customers is contractual. The utility companies' property is reconstructed by Eusco with the customers' consent and in no sense is there a trespass. Moreover, even if the doctrine did apply, title would pass to Eusco instead of the out-of-state utility companies, because the costs of the incomplete trucks purchased by the utility companies are substantially less than the costs of the labor and materials added to the trucks by Eusco. Accordingly, title would pass to Eusco after it made due compensation to the utility companies. The Commissioner's argument is without merit.

■ Next, the Commissioner argues that the utility companies constructively took possession of the new truck bodies within the state when the bodies were attached to the incomplete trucks. The Commissioner contends that since the utility companies owned the incomplete trucks delivered to Eusco, the companies were constructively within Tennessee for the purposes of receiving any tangible personal property attached to the trucks they owned. The Commissioner, however, does not cite, and we are unable to find, any authority to support such a theory.

We conclude that title and possession of the truck bodies was transferred outside the State of Tennessee when Eusco employees delivered the trucks to the utility companies' places of business in accordance with the F.O.B. delivery terms of the contracts. Since Eusco's sales and deliveries of the truck bodies to out-of-state utility companies did not involve transfers of title or possession of tangible personal property in Tennessee, we hold that the "drop shipment" sales were not taxable sales at retail "in this state."

## MANUFACTURING FOR EXPORT EXEMPTION

■ The final issue we consider on this appeal is whether the trial court erred by finding that Eusco is a manufacturer, and that therefore the sales to out-of-state customers were exempt as property "manufactured for export" under Tenn.Code Ann. § 67–6–313(a). The Commissioner contends Eusco installs, rather than manufactures, the truck bodies and related components, and that therefore the nine "drop shipment" sales involved the taxable services of "installing of tangible personal property." Tenn.Code Ann. § 67–6–102(13)(F)(vi). The Commissioner argues that the installation services involved in the "drop shipment" sales are taxable because the rendering of services in Tennessee is taxable, regardless of what happens to the property after the services are performed. *LeTourneau Sales & Serv., Inc. v. Olsen,* 691 S.W.2d 531, 536 (Tenn.1985).

In the Retailers' Sales Tax Act, there is no general definition of a "manufacturer" or "manufacturing." Although Tenn.Code Ann. § 67–6–206 (1983 & 1989) defines a manufacturer "as one whose principal business is fabricating or processing tangible personal property for resale," that definition is specifically limited to § 67–6–206, which provides an exemption for industrial machinery and a lower rate of tax upon raw materials sold to a manufacturer. In addition, the Retailers' Sales Tax Act does not contain a general definition of "installing" or "installation." Therefore, the words "manufactured" and "installing" must be given their ordinary and common meaning, since words employed by the Legislature in the enactment of tax statutes are to be taken in their natural and ordinary sense. *Covington Pike Toyota, Inc. v. Cardwell,* 829 S.W.2d 132, 135 (Tenn. 1992); *Western Pipeline Constr., Inc. v. Dickinson,* 203 Tenn. 248, 254, 310 S.W.2d 455, 458 (1958).

The trial court found that Eusco is a manufacturer because:

[n]ot that the cost is the indicia of a manufacturer's work, but the cost of the appendages and the restructuring of the

vehicle, i.e. the motor and chassis, is far more expensive than the motor and chassis itself. The mechanical and hydraulic devices added to this chassis are of such weight that the bed of the truck needs to be done in steel, which once formed could only be modified at great cost and expenditure of time. It is the total reconstruction or construction of this vehicle that causes the Court to say that it is manufactured at the plaintiff's plant. If only one hydraulic valve was necessary to modify this truck, that would not meet the test. If only one utility box or storage cabinet for tools was added to this truck, it would not meet the test. The test is met when the whole of the truck is looked at.

We find this reasoning to be inherently logical. In the course of Eusco's business, it builds truck bodies and installs related components on incomplete trucks composed of only a cab and a chassis. These incomplete trucks cost between $18,000.00 and $25,000.00, while the cost of the work performed by Eusco ranges from $42,000.00 to $57,000.00. In addition to building the truck bodies, Eusco has to modify the motors and the braking systems of the incomplete vehicles.

Eusco's construction of the truck bodies involves several different operations, beginning with the fabrication of a structural steel subframe. The subframe is welded to the chassis, and the truck body floor is thereafter fabricated and welded to the subframe. Once these operations have been performed, Eusco builds and attaches the entire truck body and related components, which include, among other things, the rear deck platform and steps, the truck body compartments and doors, the tool boxes, the tailgate, and the ladder racks. These operations require Eusco to use a ten-foot hydraulic shear for cutting sheet metal to size, and a 150-ton hydraulic press brake stamping, bending, and shaping the metal to form the truck body.

The Commissioner, however, contends that Eusco engages in the business of installing tangible personal property because a large portion of Eusco's charges are for purchasing and installing hydraulic booms used for aerial devices and digger derricks. In addition, the Commissioner contends that Eusco cannot be a manufacturer because it is registered with the Department of Revenue as a motor vehicle dealer.

While it is true that a substantial part of Eusco's costs were for purchasing and installing the hydraulic booms, Eusco made no separate charge for installation services as is required for the application of Tenn. Code Ann. § 67–6–102(22)(F)(vi). In each of the sales, the contract provided for one price which covered all personal property and labor involved in building and attaching the truck body, including all component parts.

In addition, Eusco is no less of a manufacturer for this reason. Many manufacturers purchase component parts from other manufacturers for various reasons, such as cost effectiveness, and no enterprise is required to produce every single part of the finished product from raw materials to be considered a manufacturer.

Moreover, the fact that Eusco is registered with the Department of Revenue as a motor vehicle dealer does not prohibit it from being classified as a manufacturer for purposes of Tenn.Code Ann. § 67–6–313(a). According to the undisputed testimony of Donald Eden, the president of the company, Eusco only registered as a motor vehicle dealer to obtain dealer tags so that Eusco employees could deliver the completed trucks.

In this case, giving "manufactured" and "installing" their ordinary meanings, and examining the totality of the circumstances surrounding Eusco's operations, we agree with the Chancellor that Eusco is a manufacturer of utility trucks. Our conclusion is supported by the fact that Eusco is classified as a final stage manufacturer under regulations promulgated by the National Highway Traffic Safety Administration (NHTSA) of the U.S. Department of Transportation.

Under the regulations governing vehicles manufactured in two or more stages, a "final stage manufacturer" is defined as "a person who performs such manufacturing

operations on an incomplete vehicle that it becomes a completed vehicle." 49 C.F.R. § 568.3 (1991). An "incomplete vehicle" is defined as:

> as assemblage consisting, as a minimum, of frame and chassis structure, power train, steering system, suspension system, and braking system, to the extent that those systems are to be part of the completed vehicle that requires further manufacturing, other than the addition of readily attachable components, such as mirrors or tire and rim assemblies, or minor finishing operations such as painting to become a completed vehicle.

*Id.*

The Commissioner, however, contends that even if Eusco was engaged in manufacturing, a manufacturer has to sell its product for resale in order to fall within the exemption of Tenn.Code Ann. § 67–6–313(a). Because Eusco sold its trucks to the ultimate consumers, i.e., the utility companies, the Commissioner argues that the nine "drop shipment" sales at issue in this case are not exempt from taxation.

In making this argument, the Commissioner cites Tenn.Code Ann. §§ 67–6–102(7) and 67–6–102(12)(A), (D), and (E) (1989), for the proposition that a manufacturer must sell its product for resale in order to fall within the manufacturing for export exemption.

■ The Retailers' Sales Tax Act defines "retail sales" or "sale at retail" as "a taxable sale of tangible personal property or specifically taxable services to a consumer or to any person for any purpose *other than for resale.*" Tenn.Code Ann. § 67–6–102(13)(A) (1983); Tenn.Code Ann. § 67–6–102(22)(A) (1989) (emphasis added). Items sold for resale, therefore, are exempt from the definition of ordinary retail sales, *Nasco, Inc. v. Jackson,* 748 S.W.2d 193, 194 (Tenn.1988), and items not sold for resale are taxable retail sales unless they fall within an exemption.

■ Section 67–6–313(a) provides an exemption for "articles of tangible personal property imported into this state or produced or manufactured in this state for export." Nowhere in the exemption is there a requirement that the items produced in this state for export be sold for resale.

The Code sections cited by the Commissioner for the requirement that items be sold for resale simply do not apply to § 67–6–313(a). Sections 67–6–102(7) and 67–6–102(12)(A), (D), and (E), merely define "fabricating or processing tangible personal property for resale" and "industrial machinery" for the purposes of other exemptions, such as Tenn.Code Ann. § 67–6–206 (1983 & 1989). As stated previously, § 67–6–206 exempts industrial machinery from taxation and levies a smaller tax upon raw materials sold to a manufacturer, which is defined for the purposes of that section as "one whose principal business is fabricating and processing tangible personal property for resale." There is no correlation between the exemptions provided by §§ 67–6–313(a) and 67–6–206, except for the fact that both sections provide exemptions from the Retailers' Sales Tax Act. We can only conclude that the Commissioner has misread the Retailers' Sales Tax Act and confused one exemption with another.

■ Since (1) Eusco is a manufacturer of utility trucks, (2) the trucks at issue in this case were manufactured under contracts with out-of-state utility companies, and (3) title to the trucks passed from Eusco to the utility companies outside of Tennessee, we conclude that the nine "drop shipment" sales fall within the "manufactured for export" exemption of Tenn.Code Ann. § 67–6–313(a). *See Jack Daniel Distillery v. Jackson,* 740 S.W.2d 413, 416 (Tenn.1987).

Accordingly, having found that the taxpayer's "drop shipment" sales involved the manufacturing of property for export and that the sale were not taxable retail sales "in this state," we affirm the Chancellor's judgment. The costs of this appeal are taxed to the defendant, Commissioner of Revenue, and this case is remanded to the Chancery Court for a determination of the reasonable attorneys' fees and litigation expenses to which the taxpayer is entitled

under Tenn.Code Ann. § 67–1–1803 (Supp. 1991).

REID, C.J., and DROWOTA, O'BRIEN and DAUGHTREY, JJ., concur.