993 F.2d 1546
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
BRADKEYNE INTERNATIONAL, LIMITED, Plaintiff-Appellant,
v.
DURACELL INC. and Dan Smith, individually and d/b/a DLS
Liquidators, Defendants-Appellees.
 No. 92-5703.
 United States Court of Appeals, Sixth Circuit.
 May 18, 1993.
 
 Before: RYAN and SUHRHEINRICH, Circuit Judges; and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Bradkeyne International, Limited appeals the judgment in favor of defendants following a non-jury trial in this diversity action for breach of warranty, fraud, intentional and negligent misrepresentation, and nondisclosure arising from the sale of surplus batteries. Since we find no reversable error, we AFFIRM.
 
 
 2
 * In the fall of 1988, Duracell contacted Dan Smith, a broker for companies that sell excess inventory, to arrange the sale of overstocked batteries. The price and terms of the eventual sales contracts, however, were reached between Duracell and Bradkeyne with Smith acting as intermediary.
 
 
 3
 Bradkeyne, an English corporation, purchases goods on the cut-rate market and then resells them to retailers in England and elsewhere in Europe. Bradkeyne employs agents, such as Tom Wentzel, in the United States to locate and assist in purchasing these goods.
 
 
 4
 In January of 1989, Wentzel contacted Smith and expressed Bradkeyne's interest in purchasing a large quantity of excess batteries from Duracell. Smith represented that, as far as he knew, the batteries were in good condition.
 
 
 5
 Shortly thereafter, two purchase orders for batteries were executed by Duracell and Bradkeyne. The parties agreed that the batteries would be in merchantable condition and also agreed that Bradkeyne would be allowed to inspect the batteries before they were shipped to England.
 
 
 6
 The batteries for Bradkeyne were collected from several different Duracell distribution centers, all of which are climate-controlled, in the United States. Duracell arranged for the shipment of the batteries to its Jacksonville distribution center for inspection and later shipment to England.
 
 
 7
 On March 9, 1989, Wentzel and a Bradkeyne employee, Steve Mulvaney, were given complete access to inspect the batteries in Jacksonville. Both Wentzel and Mulvaney concluded that the condition of the batteries was acceptable. After the inspection, Duracell issued invoices for the batteries, at Bradkeyne's request, and Bradkeyne began to arrange for a letter of credit.
 
 
 8
 Because of a delay in finalizing the letter of credit, Bradkeyne's shipping plans were not in place until July, 1989. The agreement between Duracell and Bradkeyne provided for the batteries to be delivered "f.o.b. Port of Jacksonville." Duracell was not responsible for selecting Bradkeyne's freight forwarder, but did hire a trucking line to carry the batteries from the distribution center to the Port of Jacksonville. Bradkeyne took receipt of the batteries when they were delivered to the port.
 
 
 9
 The first ship carrying batteries left port on July 12, 1989. The batteries on that ship arrived at the port between July 5 and 10. They were placed on the dock in metal containers and exposed to heat and humidity until they were loaded onto the ship. The second ship to sail with batteries left port on July 30, 1989. The batteries on that ship arrived at the port between July 18 and 20. They were also set on the dock until loaded on the ship ten to twelve days later. In addition, the two ships were not climate-controlled and the batteries therefore remained in "hot" conditions while in transit to England.
 
 
 10
 The batteries arrived in England in late July and early August and Bradkeyne shortly thereafter began to sell them to its customers. In September, Bradkeyne began receiving complaints about the batteries and eventually took a large number of them back from customers that complained. Bradkeyne informed Smith and officials at Duracell of the problems with the batteries in November, 1989, and eventually sent Duracell a formal notice of rejection on January 24, 1990. By that time, however, Bradkeyne had sold or disposed of all of the batteries, though many were sold at vastly reduced prices.
 
 
 11
 Bradkeyne was not the only customer that purchased overstocked batteries from Duracell. Numerous other companies, all located in the United States, bought overstocked batteries from Duracell during the same time period. One of those companies, Maier International, received complaints from two of its customers because a small number of batteries they purchased were either leaking or lacking in charge. Those complaints involved approximately three hundredths of one percent of the batteries purchased by Maier and Duracell replaced them. Other than Bradkeyne and Maier, no other complaints regarding the overstocked batteries were received.
 
 
 12
 Bradkeyne filed the present action for breach of warranty, fraud and intentional misrepresentation, negligent misrepresentation, and nondisclosure under Restatement (Second) of Torts § 551 (1977), in the United States District Court for the Eastern District of Tennessee on February 28, 1990. Jurisdiction is based on diversity of citizenship.
 
 
 13
 On November 25, 1991, the district court granted partial summary judgment in favor of Smith on the breach of warranty claim. A bench trial was held on February 18 through 28, 1992, on the remaining claims. At the close of Bradkeyne's proof, the court granted Smith's motion to dismiss the remaining claims as to him. The court also granted Duracell's motion to dismiss the claim of fraud and intentional misrepresentation and withheld ruling on the remaining issues. Subsequently, on April 20, 1992, the district court entered an Order and Memorandum Opinion in favor of Duracell, which included findings heretofore set out, on the remaining issues. Bradkeyne filed a timely notice of appeal, and this court has jurisdiction pursuant to 28 U.S.C. § 1291 (1988).
 
 II
 
 14
 Under Rule 52(a) of the Federal Rules of Civil Procedure, this court reviews a district court's findings of fact only for clear error. Thus, we will overturn a district court's findings of fact only when we are "left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395 (1948). This court has noted that
 
 
 15
 the reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court.... If the district court's account of the evidence is plausible in light of the record, viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
 
 
 16
 Henry v. Lennox Indus., Inc., 768 F.2d 746, 750 (6th Cir.1985). A district court's determination of questions of law is reviewed de novo. Loudermill v. Cleveland Bd. of Educ., 844 F.2d 304, 308 (6th Cir.), cert. denied, 488 U.S. 946 (1988).
 
 III
 
 17
 Bradkeyne contends that the batteries were not merchantable because they suffered from a latent manufacturing defect that caused leakage and low voltage. Bradkeyne presented two expert witnesses at the bench trial who opined that a manufacturing defect, i.e., inadequate sealant, caused the batteries to leak and lose power. Neither expert, however, actually observed this defect in the Bradkeyne batteries. They merely speculated that inadequate sealant might have caused the problems associated with the batteries.
 
 
 18
 If the experts' contentions were correct, then some of the other companies who purchased some of the same batteries from Duracell would have likely encountered similar problems. None did. The district court therefore reasonably concluded that the problems associated with the batteries purchased by Bradkeyne were due to environmental abuse, specifically, the severe heat and humidity to which they were subjected between delivery to Bradkeyne at the Port of Jacksonville and their eventual arrival in England. Both experts agreed that severe environmental abuse could cause rusting, corrosion and low power problems, the very problems associated with Bradkeyne's batteries. The district court's conclusion that the batteries suffered from no latent manufacturing defect and were therefore merchantable when delivered to Bradkeyne at the Port of Jacksonville is not clearly erroneous.
 
 IV
 
 19
 Duracell expressly warranted that the batteries would be merchantable. In addition, Tennessee law, Tenn.Code Ann. § 47-2-314 (1992), imposes an implied warranty of merchantability on the seller of goods. The district court therefore ruled that the two warranties merged. That ruling is not questioned. The issue for the district court to resolve was, therefore, when did the risk of loss pass. The district court found that risk of loss passed when the batteries were delivered to Bradkeyne at the Port of Jacksonville. Both the terms of the contract and applicable law support that finding.
 
 
 20
 According to the letter of credit, the purchase order contracts were f.o.b. Jacksonville Port, Florida. This means that the risk of loss passed when the goods were duly delivered to Bradkeyne at the Port of Jacksonville. See, for example, Eusco v. Huddleston, 835 S.W.2d 576 (Tenn.1992); Tenn.Code Ann. § 47-2-509(1)(a) (1992). The district court found that Duracell duly delivered the batteries to Bradkeyne on the dock in Jacksonville and that the risk of loss therefore passed at that time.
 
 
 21
 Bradkeyne attempts to prevent application of this clear rule of law by relying on Tenn.Code Ann. § 47-2-510, under which the risk of loss does not pass at the time of delivery to the buyer. As the district court pointed out, however, Tenn.Code Ann. § 47-2-510 only applies to delivery of non-conforming goods. Since the district court found that the batteries suffered from no latent defect when delivered, the goods were conforming. Tenn.Code Ann. § 47-2-509(3) therefore controls, and under that provision risk of loss passed at the time of delivery. The contract between the parties also provided that risk of loss passed at delivery. The district court therefore did not err in so holding.
 
 V
 
 22
 Bradkeyne next contends that defendants made misrepresentations by stating that the batteries were merchantable. Since the district court was not clearly erroneous in finding that the batteries were merchantable when delivered to Bradkeyne, no misrepresentations were made.
 
 
 23
 Bradkeyne next contends that Duracell is liable for nondisclosure. Under Restatement (Second) of Torts § 551 (1977), a seller has a duty to disclose information acquired after a transaction, if the seller knows that the information will make past representations untrue or misleading. Bradkeyne contends that Duracell had a duty to disclose the fact that Maier International, who bought some of the same batteries, received complaints about the batteries from two of its customers. As detailed above, those complaints represented three hundredths of one percent of the batteries purchased by Maier.[1] The district court ruled that the complaints were insignificant and therefore Duracell was under no duty to disclose the information to Bradkeyne. In so ruling, the district court committed no error.
 
 VI
 
 24
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Three hundredths of one percent of the batteries purchased by Maier is approximately 200 batteries. Notwithstanding the complaints they received, Maier wanted to purchase more overstock batteries from Duracell, but they had all been sold