IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 8, 2019 Session

## CHECK PRINTERS, INC. v. DAVID GERREGANO ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 15-598-IV          Russell T. Perkins, Chancellor**

———————————————————————

**No. M2018-01030-COA-R3-CV**

———————————————————————

This case involves the Commissioner of Revenue for the State of Tennessee's audit and subsequent adjustment of sales tax due from Appellant, Check Printers, under the Tennessee Retailers Sales Tax Act, Tennessee Code Annotated section 67-6-101, *et seq.* The trial court granted the Commissioner's motion for summary judgment finding that, although Appellant manufactured the disputed products in Tennessee and ultimately exported the products outside the state, under Appellant's standard contract language, title passed to the customer in Tennessee at the time the product was tendered for shipping. Based on this intervening taxable event, i.e., the "sale," as that term is defined in Tennessee Code Annotated section 67-6-102(80)(A), the trial court concluded that the products were not excluded from taxation under either the manufactured-for-export exemption, Tennessee Code Annotated section 67-6-313(a), or the sale-for-resale exemption, Tennessee Code Annotated section 67-6-102(75)(a). Because there is a dispute of material fact concerning whether Appellant's sale of blow-in cards to its customer, AMI, was consummated in Tennessee, we vacate the trial court's grant of summary judgment only as to the AMI blow-in cards; the trial court's order is otherwise affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Vacated in Part, Affirmed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA D. MCGEE, J., joined.

Michael D. Sontag, Stephen J. Jasper, and Michael A. Cottone, Nashville, Tennessee, for the appellant, Check Printers, Inc.

Herbert H. Slatery, III, Attorney General and Reporter, Andrée Blumstein, Solicitor General, and R. Mitchell Porcello, Senior Assistant Attorney, for the appellees,

Commissioner of Revenue for the State of Tennessee, and State of Tennessee - Civil.

**OPINION**

**I. Background**

Check Printers, Inc. ("Check Printers," or "Appellant") is a commercial printing company founded in 1960 for the specific purpose of printing checks for banks in the Middle Tennessee area. Since that time, the company's operations have expanded to include the manufacture and sale of a wide range of printed commercial products. In 2004, Check Printers became a wholly-owned indirect subsidiary of R.R. Donnelley and Sons ("R.R. Donnelley"). R.R. Donnelley has approximately 150 printing facilities in North America and is one of the largest printers in the world. During all relevant times, Check Printers had two facilities: one in Antioch, Tennessee and one in North Carolina. This appeal concerns the tax consequences flowing from the operations at Check Printers' Antioch facility during the relevant time period.

After completing audits of Check Printers for the period of July 1, 2006 through December 1, 2010 (the "Audit Period"), on April 10, 2015, the Commissioner of the Tennessee Department of Revenue ("Commissioner," or "Department," and together with the State of Tennessee, "Appellees") issued a Notice of Adjusted Amounts Due. The adjusted tax assessment consisted of sales and use tax in the amount of $4,098,468.17, plus interest (for the period of January 1, 2008 through December 31, 2010), and state and local business tax in the amount of $323,443.36, plus penalties and interest (for the period of July 1, 2006 through December 31, 2010). The adjusted tax amount, interest, and penalties totaled $6,183,675.31. In making the assessment, the Commissioner determined that Check Printers' principal business, during the Audit Period, was the sale of services, rather than manufacturing. However, in its memorandum and final order, *infra*, the trial court concluded that Check Printers was, in fact, a manufacturer entitled to exemption from business tax. Tenn. Code Ann. §§ 67-4-712(b)(2) and 67-6-206. The parties do not appeal the trial court's conclusion that Check Printers is a manufacturer or its amendment of the Commissioner's adjusted tax amount to reflect Check Printers' manufacturer exemption. As such, we will neither address nor disturb this portion of the trial court's order.

During the Audit Period, Check Printers printed various items at its Antioch facility, including checkbooks, catalog components, check starter kits, coupon payment booklets, mortgage closing packages, monthly billing statements, utility bills, *etc*. After Check Printers completed an order, it shipped the order to its customers or to other customer-designated parties in the chain of production and/or distribution. Check Printers also printed blow-in cards, which are inserted into magazines to solicit subscriptions. As is relevant to this appeal, Check Printers manufactured blow-in cards

for American Media, Inc. ("AMI") and Martha Stewart-Finishing ("Martha Stewart"). The blow-in cards were printed at the Antioch facility and then shipped to an out-of-state R.R. Donnelley facility; the out-of-state facility printed the magazines for AMI and Martha Stewart, inserted the blow-in cards into the magazines, and then shipped the magazines to AMI and Martha Stewart or to their subscribers. For its shipping, Check Printers primarily used the United States Postal Service ("USPS"), which was located at the Antioch facility, but it shipped some products through common carriers such as United Parcel Service and Federal Express. When Check Printers shipped materials that were printed at the Antioch facility (including the blow-in cards) to other states, it did not charge, collect, or remit sales tax in Tennessee.

After the Commissioner's audit, the parties participated in an informal taxpayer conference concerning the Notice of Adjusted Amounts Due. As part of this process, on August 24, 2015, Check Printers sent a detailed letter disputing the assessment. In the letter, Check Printers asserted, *inter alia*, that: (1) the Department is not permitted to assess Tennessee tax on sales in interstate commerce; and (2) Check Printers' sale of blow-in cards qualifies for either the magazine exemption or, alternatively, for the sale-for-resale tax exemption. On February 26, 2015, the Department's Administrative Hearing Officer issued a determination upholding the assessment. Specifically, the Hearing Officer rejected Check Printers' interstate commerce objection on the ground that title to the printed materials transferred to Check Printers' customers while the materials were still in Tennessee, thus creating a taxable event in Tennessee, *see* further discussion *infra*. Concerning the blow-in cards, the Hearing Officer concluded that these cards were not "components" of the magazines, thus negating application of the magazine exemption. The Hearing Officer also rejected Check Printers' argument that the blow-in cards were sales for resale. Accordingly, the Hearing Officer declined to adjust the Department's assessment.

On May 14, 2018, Check Printers filed this action in the Davidson County Chancery Court ("trial court"). As is relevant to the instant appeal, in count one of its complaint Check Printers challenged the Department's assessment of sales and use tax on printed products that Check Printers caused to be shipped by common carriers to destinations outside the State of Tennessee. Concerning these transactions, which we read to include all materials printed at the Antioch facility including blow-in cards, Check Printers asserted that they involved products "manufactured for export" and should, therefore, be exempt from sales and use tax under the plain language of Tennessee Code Annotated section 67-6-313(a), *infra*. Concerning the blow-in cards, in count four of the complaint, Check Printers claimed that the blow-in cards should qualify for the "sale for resale" exemption under Tennessee Code Annotated section 67-6-102(75)(a), *infra*. Specifically, Check Printers argued that the blow-in cards become part of the magazines, which are then resold by other companies; thus, the blow-in cards (as part of the resold

- 3 -

magazines) qualify for the "sale for resale" exemption from sales tax.[1]

The parties filed cross motions for summary judgment.[2] The trial court heard the motions on July 19, 2017. In its memorandum and final order, filed on May 23, 2018, the trial court granted the parties' respective motions in part. The trial court granted Check Printers' motion concerning its designation as a manufacturer for business tax purposes and adjusted the amount of the tax assessment to reflect that designation. As previously noted, the parties do not appeal this portion of the trial court's ruling. The trial court granted the Department's motion as to the sales tax issues, *see discussion infra*, finding that neither the sale-for-resale nor the manufactured-for-export exemptions applied to Check Printers' sales of the disputed tangible personal property. Check Printers appeals.

---

[1] In count three of the complaint, Check Printers alleged that it is entitled to the magazine exception for the blow-in cards it produced for AMI and Martha Stewart. Specifically, Check Printers asserted that "[b]ecause the blow-in cards are components of [AMI and Martha Stewart's] respective magazines, the production of the blow-in cards should qualify for the exemption available to magazines." The trial court held that the blow-in cards were not magazines and, as such, were not tax exempt under Tennessee Code Annotated section 67-6-329(a)(16) Check Printers does not appeal this holding; accordingly, we neither address the magazine exemption nor disturb the trial court's holding on same.

[2] As discussed by the Tennessee Supreme Court in *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73 (Tenn. 2010):

> Tenn. R. Civ. P. 56 permits any party to move for summary judgment regardless of whether that party is the plaintiff or the defendant. Accordingly, the courts are sometimes confronted with cross-motions for summary judgment. Although many cases with competing motions for summary judgment can be disposed of based on these motions, it does not necessarily follow that a summary judgment must be granted to one side or the other simply because both parties have moved for a summary judgment. The fact that both parties are arguing simultaneously that there is no genuine issue of material fact does not establish that a trial is unnecessary.
> Cross-motions for summary judgment are no more than claims by each side that it alone is entitled to a summary judgment. The court must rule on each party's motion on an individual and separate basis. With regard to each motion, the court must determine (1) whether genuine disputes of material fact with regard to that motion exist and (2) whether the party seeking the summary judgment has satisfied Tenn. R. Civ. P. 56's standards for a judgment as a matter of law. Therefore, in practice, a cross-motion for summary judgment operates exactly like a single summary judgment motion.
> When considering individual competing cross-motions for summary judgment, the court must take care to resolve all factual disputes and any competing rational inferences in the light most favorable to the party opposing each motion. The denial of one motion does not necessarily imply that the other party's motion should be granted. Both summary judgment motions should be denied if the court finds that there is a genuine dispute regarding a material issue of fact with regard to both motions, or if the parties disagree as to the inferences or conclusions to be drawn from the facts material to both motions . . . .

*Id.* at 82-83 (internal citations omitted).

## II. Issues

Check Printers present three issues for review:

1.  Whether [Check Printers'] sales of "blow-in cards" were sales of items "intended for subsequent resale by the purchaser" exempt from Tennessee sales tax under Tenn. Code Ann. §§ 67-6-102(75)(A), [67-6]-102(76), and [67-6]-202(a) when the blow-in cards were inserted into and became component parts of magazines sold by [Check Printers'] customers.

2.  Whether [Check Printers'] sales of printed products shipped to other states were sales of products "manufactured in this state for export" exempt from Tennessee sales tax under Tenn. Code Ann. § 67-6-313(a) when [Check Printers] fabricated the products in Tennessee and immediately thereafter shipped those products to locations outside Tennessee through the United States Postal Service or other common carrier.

3.  Whether [Check Printers'] sales of "blow-in cards" to American Media Incorporated were subject to Tennessee sales tax when neither title to nor possession of the blow-in cards passed from [Check Printers] to American Media Incorporated in Tennessee.

## III. Standard of Review

This case was decided by summary judgment. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Rye*, 477 S.W.3d at 250 (citing *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013); *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

As set out at Tennessee Code Annotated section 20-16-101:

In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:

(1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or

(2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

However, "a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis." *Rye*, 477 S.W.3d at 264. Rule 56.03 requires the moving party to support its motion with "a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record. *Id*. If the moving party fails to meet its initial burden of production, the nonmoving party's burden is not triggered, and the court should dismiss the motion for summary judgment. *Town of Crossville Hous. Auth*., 465 S.W.3d 574, 578–79 (Tenn. Ct. App. 2014) (citing *Martin v. Norfolk S. Ry. Co*., 271 S.W.3d 76, 83 (Tenn. 2008)). As the Tennessee Supreme Court has stated:

> [T]o survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye*, 477 S.W.3d at 265. If adequate time for discovery has been provided and the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial, then the motion for summary judgment should be granted. *Id.* Thus, even where the determinative issue is ordinarily a question of fact for the jury, summary judgment is still appropriate if the evidence is uncontroverted and the facts and inferences to be drawn therefrom make it clear that reasonable persons must agree on the proper outcome or draw only one conclusion. *White v. Lawrence*, 975 S.W.2d 525, 529–30 (Tenn. 1998).

However, if there is any uncertainty concerning a material fact, then summary judgment is not the appropriate disposition. As stated by the Tennessee Supreme Court in *EVCO Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975):

The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He [or she] is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

*Id*. at 24-25.

To the extent that the issues raised in this appeal require us to interpret and apply statutes, we note that statutory interpretation is a question of law, which we review de novo, affording no presumption of correctness to the conclusions of the trial court. *State v. Crank*, 468 S.W.3d 15, 21 (Tenn. 2015); *In re Baby*, 447 S.W.3d 807, 817 (Tenn. 2014); *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013) (citing *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009)).

The principles of statutory interpretation are well established. When reading "statutory language that is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Eastman Chemical Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). "[W]e presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing." *SunTrust Bank v. Burke*, 491 S.W.3d 693, 695 (Tenn. Ct. App. 2015), *perm. app. denied* (Tenn. June 15, 2015) (quoting *Lind v. Beaman Dodge*, 356 S.W.3d 889, 895 (Tenn. 2011)). "When a statute is clear, we apply the plain meaning without complicating the task." *In re Baby*, 447 S.W.3d 807, 817 (Tenn. 2014). However, when a statute is ambiguous, "we may reference the broader statutory scheme, the history of the legislation, or other sources." *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008). Our duty in construing statutes is to ascertain and give effect to the intention and purpose of the legislature. *See Lipscomb v. Doe*, 32 S.W.3d 840, 844 (Tenn. 2000). To the extent that these issues involve questions of fact, our review of the trial court's ruling is de novo with a presumption of correctness. Tenn. R. App. P. 13. Accordingly, we may not reverse these findings unless they are contrary to the preponderance of the evidence. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).

Furthermore, courts must liberally construe statutes that impose a tax in favor of the taxpayer and strictly construe them against the taxing authority. *Eastman Chemical*, 151 S.W.3d at 507. "[W]here there is doubt as to the meaning of a taxing statute, the doubt must be resolved in favor of the tax payer." *Commercial Standard Ins. Co. v.*

*Hixson*, 133 S.W.2d 493, 494 (Tenn. 1939). This construction, however, must be fair and give effect to the language of the statute. *See, e.g.,* **International Harvester Co. v. Carr**, 466 S.W.2d 207, 214 (Tenn. 1971); **United Inter-Mountain Tel. Co. v. Moyer**, 426 S.W.2d 177, 181 (Tenn. 1968).

Here, Check Printers asserts that it is entitled to certain tax exemptions. While statutes imposing taxes are to be construed in favor of the tax payer, tax exemption statutes are strictly construed against tax payers. *See, e.g.,* **Steele v. Indus. Dev. Bd. of Metro. Gov't of Nashville and Davidson Co.**, 950 S.W.2d 345, 348 (Tenn. 1997) (citations omitted). Taxpayers must carry the burden of showing entitlement to tax exemptions; such exemptions will not be implied. **Hutton v. Johnson**, 956 S.W.2d 484, 488 (Tenn. 1997) (citing **American Cyanamid Co. v. Huddleston**, 908 S.W.2d 396, 400 (Tenn. Ct. App. 1995)). In Tennessee, there is a presumption against tax exemption "and any well-founded doubt defeats a claimed exemption." ***Id***. In any event, unless the text of a revenue statute requires otherwise, courts are to give the words in the statute their natural and ordinary meaning and to enforce revenue statutes as written. **Eastman Chemical**, 151 S.W.3d at 507; **Stratton v. Jackson**, 707 S.W.2d 865, 866 (Tenn. 1986).

## IV. Analysis

At issue in this case is the imposition of sales tax under the Tennessee Retailers Sales Tax Act, Tennessee Code Annotated section 67-6-101, *et seq.* (the "Act"). As discussed by the Tennessee Supreme Court,

> Tennessee's tax policy . . . seeks to place the ultimate burden for the payment of sales and use tax on the end user of the tangible personal property. Accordingly, intermediary dealers are relieved of the burden of collecting and remitting sales or use tax when they are not an end user.

***COA Holdings, Inc. v Trost***, 333 S.W.3d 73, 84 (Tenn. 2010). "Thus, persons or entities falling within the statutory definition of 'dealer' are permitted certain exemptions from the payment of sales or use tax." ***Id.***[3] Here, Check Printers claims two exemptions: (1) the "sale for resale" exemption regarding the blow-in cards; and (2) the "manufactured for export" exemption for all products, including the blow-in cards. We will address each of these exemptions below.

### A. Sale-for-Resale Exemption for Blow-in Cards

As defined at Tennessee Code Annotated section 67-6-102(75)(A),

---

[3] "Dealer" is defined, in relevant part, as any person or entity that "[m]anufactures or produces tangible personal property for sale at retail, for use, consumption, distribution, or for storage to be used or consumed in this state." Tenn. Code Ann. § 67-6-102(23)(A)

"Resale" means a subsequent, bona fide sale of the property . . . by the purchaser. "Sale for resale" means the sale of the property . . . intended for subsequent resale by the purchaser. Any sales for resale shall, however, be in strict compliance with rules and regulations promulgated by the commissioner.

Conversely, a "retail sale" or "sale at retail" is defined as "any sale . . . for any purpose other than for resale . . . ." Tenn. Code Ann. § 67-6-102(76). "The courts have construed the phrase 'for any purpose other than for resale' as creating an exemption that excludes sales for resale from taxation." *COA Holdings*, 333 S.W.3d at 84 (*citing Eusco, Inc. v. Huddleston*, 835 S.W.2d 576, 582 (Tenn. 1992) (citation omitted)).

As discussed more thoroughly below, a "sale" and, therefore, a "resale," includes "any transfer of title or possession, or both . . . in any manner or by any means whatsoever of tangible personal property for a consideration . . . ." Tenn. Code Ann. § 67-6-102(78)(A). As succinctly stated by the Tennessee Supreme Court,

[a] sale must satisfy two criteria in order to qualify as a sale for resale. First, the sale must have been made for the purpose of resale. Tenn. Code Ann. § 67-6-102[(76)]. Second, the sale must be "in strict compliance with rules and regulations promulgated by the [C]ommissioner." Tenn. Code Ann. § 67-6-102[(75)](A). . . .

*COA Holdings*, 333 S.W.3d at 84.

As set out in Check Printers' brief, the crux of its argument that the blow-in cards manufactured at the Antioch facility qualify for the sale-for-resale tax exemption rests on the proposition that the cards became component parts of the magazines sold by AMI and Martha Stewart. Specifically, the brief states:

Under the Department's regulations, the sale-for-resale exemption includes items that become "a component part of the finished product" that is resold. Tenn. Comp. R. & Regs. 1320-05-01-.62(1); *see also* Tenn. Code Ann. § 67-6-329(a)(12).

Check Printers' sales of blow-in cards qualify as exempt sales for resale under both the controlling statute and regulation. The blow-in cards were shipped to another R.R. Donnelley facility and became part of the magazines sold to Check Printers' customers. After that, Martha Stewart and AMI resold the blow-in cards to their own customers as component parts of the magazines. Accordingly, the blow-in cards were both "intended for subsequent resale by the purchaser" and became "a component part of the finished product." Check Printers' sales of those cards, therefore, were sales for resale exempt from sales tax.

As cited in the foregoing portion of Appellant's brief, Tennessee Code Annotated section 67-6-329(a)(12) provides a tax exemption for

> [i]ndustrial materials and explosives for future processing, manufacture or conversion into articles of tangible personal property for resale where the industrial materials and explosives become **a component part** of the finished product or are used directly in fabricating, dislodging, or sizing. . . .

(Emphasis added). Appellant also cites Tenn. Comp. R. & Regs. 1320-05-01-.62(1), which states that

> "Sales for resale" means those whereby a supplier of materials, supplies, equipment and services makes such tangible personal property or services available to legitimate dealers actually selling such property or services **as such**, **or which becomes an industrial material or supply in a manufacturing or processing operation.**

*Id.* (Emphases added).

It is undisputed that the blow-in cards are not sold by AMI or Martha Stewart "as such." *Id*. In other words, Check Printers printed and sold the cards to AMI and Martha Stewart, but AMI and Martha Stewart did not resell the actual cards to their customers. Accordingly, the blow-in cards, "as such," were not "intended for subsequent resale by the purchaser." Tenn. Code Ann. § 67-6-102(78)(A). Therefore, the applicability of the sale-for-resale exemption turns on the question of whether the blow-in cards "bec[a]me a component part" of the finished magazine or whether they constitute an "industrial material or supply in the manufacturing . . . operation." Tenn. Comp. R. & Regs. 1320-05-01-.62(1). In ruling on this question, the trial court, in its May 23, 2018 order, adopted the Commissioner's position. Specifically, the order holds that

> [t]he blow-in reply cards that [Check Printers] sold to AMI and Martha Stewart did not "become[] an industrial material or supply in a manufacturing or processing operation." Tenn. Comp. R. & Reg. 1320-05-01-.62(1). Likewise, they did not "become a component part of the finished product" . . . . Tenn. Code Ann. § 67-6-329(a)(12). The blow-in reply cards were inserted into magazines so that consumers could remove the cards, fill them out, and return them to sign up for magazine subscriptions. The blow-in reply cards were thus purchased by AMI and Martha Stewart for their own use, for the purpose of advertising and selling magazine subscriptions. Magazine purchasers did not purchase blow-in reply cards as part of the purchase of a magazine. The blow-in reply cards are in no way similar to paper, glue, ink, and related materials that were

- 10 -

used to fabricate and become component parts of the finished magazines.

We agree with the trial court. In reviewing the trial court's determination that the blow-in cards did not satisfy the requirements for application of the sale for resale tax exemption, we find guidance in the Tennessee Supreme Court case of ***Kingsport Publishing, Corp. v. Olsen***. Like the case at bar, ***Kingsport Publishing*** involved the insertion of materials, i.e., advertisements and visual aids, into finished printed products, i.e., newspapers.

In ***Kingsport Publishing***, a newspaper publisher brought an action to recover for use taxes paid on certain items of personal property used in publishing its newspaper. ***Kingsport Publishing, Corp. v. Olsen***, 667 S.W.2d 745, 745 (Tenn. 1984). The contested items included "graphs and charts purchased by the plaintiff for use in illustrating news stories, for example, a chart of the Consumer Price Index used in the newspapers to illustrate a story concerning the cost of living or inflations." ***Id***. at 746. Other contested items included "advertising books." These "advertising books" contained "pictures of items that [were] advertised for sale in the plaintiff's newspapers, such pictures being incorporated into the newspaper by transferring images, photographically from the original 'advertising book' source onto the printed page of the newspaper." ***Id.*** In holding that the foregoing items did not constitute "component parts" or "industrial materials" for tax exemption purposes, the ***Kingsport Publishing*** Court reiterated the requirement that tax exemption statutes are to be construed strictly against the tax payer, to-wit:

> Thus, strictly construing an exemption from a use tax of materials which become a component part of a finished manufactured product, it has been held that to make out the exemption it is necessary that the materials have actually gone **into the finished product as an ingredient or component**, that such an exemption applies only to such personal property as has been chemically or mechanically incorporated into the finished product. *See*, 68 Am. Jur. 2d at 298-99 *Sales and Use Taxes* § 225 and cases there cited (1973).

> ***

> Giving the exemption the strict construction that we are required to do, we hold that these graphs and charts and "advertising books" and any other items which are incorporated into the finished product newspaper by means of transferring images photographically or by some other similar process do not become component parts of the finished product and are not use "directly in fabricating . . . converting, or processing" of industrial materials within the meaning of the exemption statute.

- 11 -

*Id*. at 746-47 (emphasis added).

In this case, the connection between the blow-in cards and the AMI and Martha Stewart magazines is even more tenuous than the connection among the graphs, charts, and advertising books and the newspapers at issue in ***Kingsport Publishing***. While we concede that the blow-in cards were placed "into the finished product" in that they were inserted within the pages of the AMI and Martha Stewart magazines, the cards were not put into the magazines as "an ingredient or component" in the sense contemplated by the sale for resale exemption. ***Id***. In ***Kingsport Publishing***, the graphs, charts, and advertising were actually transferred photographically (or otherwise) onto the newspaper pages, ***Id.*** at 745, yet the Court held that such integration did not result in the graphs, charts, and advertising becoming "component parts of [the] finished product within the meaning of [the] tax exemption statute." ***Id***. Likewise, the insertion of blow-in cards (which are meant to be removed, filled out, and returned to AMI and Martha Stewart) into the finished magazines does not constitute integration as a component part of the magazines. As such, we affirm the trial court's conclusion that the sale-for-resale tax exemption does not apply to Check Printers' sale of blow-in cards.

### B. Manufactured-for-Export Exemption

As discussed by the Tennessee Supreme Court in ***Hearthstone, Inc. v. Hardy Moyers***:

> For a transaction to be taxable pursuant to Tennessee's sales tax, certain taxable events must occur in Tennessee. Tennessee Code Annotated, § 67-6-201(1), provides:
>
> > It is declared to be the legislative intent that every person is exercising a taxable privilege who . . . engages in the business of selling tangible personal property at retail *in this state*.
>
> (Emphasis added). Tennessee Code Annotated, § 67-6-202, provides:
>
> > For the exercise of the privilege of engaging in the business of selling tangible personal property at retail *in this state*, a tax is levied at the rate of five and one-half percent of the sales price of each item or article of tangible personal property when sold at retail in this state; the tax is to be computed on gross sales for the purpose of remitting the amount of tax due the state and is to include each and every retail sale.
>
> (Emphasis added.)

- 12 -

"The elements necessary to constitute a sale are (1) transfer of title or possession, or both, of (2) tangible personal property, for a (3) consideration." ***Volunteer Val–Pak v. Celauro***, 767 S.W.2d 635, 636 (Tenn. 1989); Tenn. Code Ann. § 67-6-102([78])(A).

***Hearthstone, Inc. v. Hardy Moyers***, 809 S.W.2d 888, 890 (Tenn. 1991) (emphases in original). When a sale occurs in Tennessee, it is a taxable event. *See, e.g.,* ***Mast Advert. & Pub., Inc. v. Moyers***, 865 S.W.2d 900, 902-903 (Tenn. 1993) (relying on ***Hearthstone***, 809 S.W.2d at 890). However, Tennessee Code Annotated section 67-6-313(a) provides, in relevant part, that "[i]t is not the intention of this chapter to levy a tax upon articles of tangible personal property . . . produced or manufactured in this state for export." Check Printers argues that all of the products at issue, including the blow-in cards, are exempt from taxation under Tennessee Code Annotated section 67-6-313(a). As set out in its appellate brief, Check Printers contends that it "manufactured all of the products at issue in this appeal 'for export' within the plain meaning of the manufactured-for-export exemption." Relying on the language of section 67-6-313(a), Check Printers argues that the manufactured-for-export exemption requires only two conditions: (1) "the tangible personal property that is sold must be produced or manufactured in this state;" and (2) "the property must be produced for export by the seller." Check Printers maintains that "[i]f these two conditions are met, a sale that would otherwise be subject to Tennessee sales tax is, nonetheless, exempt." First, the Department does not dispute that Check Printers "manufactured" the disputed products in Tennessee. Indeed, the record clearly and undisputedly establishes this fact. Furthermore, the Department does not dispute that the products were ultimately exported to other states, and the record undisputedly establishes this fact. However, the Department counters that, under Check Printers' standard contract terms, *infra*, title to the disputed products transferred to the purchasers at the time the products were tendered to the USPS or a common carrier for shipping. Because the products were undisputedly tendered to the carriers in Tennessee, the Department maintains that the taxable event, i.e., the "sale" of these products, occurred in Tennessee such that Tennessee is entitled to collect taxes on same.

In denying Check Printers tax exemption under the manufactured-for-export exemption, the trial court's order adopted the Department's argument that,

> [h]ere, delivery to [Check Printers'] customer in the destination state is not the taxable event for sales tax purposes. Rather, the contractual transfer of title to [Check Printers'] customers in Tennessee is the taxable event . . . .

The trial court went on to hold that

> [w]hen the sale is completed in Tennessee, sales tax is owed in Tennessee. The fact that products were shipped outside Tennessee after the sale was accomplished does not entitle Check Printers to the manufactured for

- 13 -

export exemption under the circumstances of this case. The exemption, reading the straightforward language of the applicable statute, does not provide an exemption for shipping products outside Tennessee in a vacuum, without taking into account that the exemption is from the obligation to pay sales tax. If the taxable sale occurs in Tennessee, then it follows that the product is not manufactured for export tax purposes. *See Board of Publication of Methodist Church, Inc. v. Woods*, 609 S.W.2d 501, 504-05 (Tenn. 1980). Consequently, although the "manufactured for export" exemption appears to apply when a taxpayer manufactures products in Tennessee and ships them to another state before a taxable sale occurs in Tennessee does not apply here. *See Eusco, Inc. v. Huddleston*, 835 S.W.2d 576, 580-83 (Tenn. 1992). . . .

It is undisputed that R.R. Donnelley's standard contract terms, which Check Printers used during the Audit Period, provided:

Title to and risk of loss for finished and semi-finished work shall pass to Customer upon the earlier of RR Donnelley's delivery to carrier or USPS f.o.b. RR Donnelley plant of final manufacture, or delivery into storage, regardless of whether the transport medium or storage facilities are owned and/or operated by RR Donnelley and regardless of whether RR Donnelley charges Customer for storage.

As set out above, Tennessee Code Annotated section 67-6-102(78)(A), defines a "Sale," in pertinent part as "any transfer of title or possession . . . conditional or otherwise, in any manner or by any means whatsoever of tangible personal property for a consideration." In its final order, the trial court found that there was no dispute that a "sale" for purposes of taxation occurred at the point where title to the finished (or semi-finished) product transferred. We agree. Pursuant to the contractual language, i.e., "[t]itle to . . . finished . . . work shall pass to the Customer upon . . . R.R. Donnelley's delivery to carrier or USPS," a "sale," as that term is defined to include "any transfer of title . . . for consideration," occurred in Tennessee. Nonetheless, Check Printers argues that the manufactured for export exemption applies to the products at issue because the requirements set out in section 67-6-313(a) were satisfied, i.e., the products were manufactured in Tennessee and were exported outside the State. In other words, Check Printers maintains that the intervening "sale," at the point of delivery to the carrier, did not constitute a taxable event in Tennessee so long as Check Printers ultimately exported the products it manufactured in this State.

In addressing Check Printers' arguments, it is helpful to parse some of the cases addressing the application of the manufactured for export exemption. In *Board of Publication of Methodist Church v. Woods*, 609 S.W.2d 501 (Tenn. 1980), a publishing firm located in Tennessee printed and then delivered catalogs to an agent of the out-of-

state buyer. *Id.* at 501. The delivery occurred in Tennessee. Following delivery by the publishing firm, the buyer's agent affixed mailing labels to the catalogs and delivered them to the post office, or other carrier, for shipment to out-of-state addresses. *Id.* at 502. Under these facts, the Tennessee Supreme Court held that the manufactured for export exemption (then codified at Tennessee Code Annotated section 67-3003) did not apply. In so holding, the Court reasoned that,

> [s]ince the transfer of possession of "sale" took place within Tennessee, clearly the transaction was intended to be taxed under T.C.A. s 67-3003 and was not exempt from taxation under the Commerce Clause . . . even though the parties contemplated immediate exportation.

*Id*. at 504 (citations omitted). In reaching its conclusion, the Court distinguished the **Board of Publication** case from the cases of **Beecham Laboratories v. Woods**, 569 S.W. 2d 456 (Tenn. 1978), and **Young Sales Corp. v. Benson**, 450 S.W.2d 574 (Tenn. 1970), "because in neither of those cases was there an allegation that a sale or transfer of possession to a buyer took place in Tennessee." **Board of Publication**, 609 S.W.2d at 504. The Court also distinguished the case of **Service Merchandise Co., Inc. v. Tidwell**, 529 S.W.2d 215 (Tenn. 1975). In **Service Merchandise**, "the State was attempting to levy a tax on materials that were already in interstate commerce before they arrived in Tennessee and that were still in interstate commerce at the time the State wished to impose taxation." **Board of Publication**, 609 S.W.2d at 504. In distinguishing **Service Merchandise,** the **Board of Publication** Court noted that "in the present case interstate commerce had not yet begun when the catalogs were delivered to or picked up by" the buyer's agent in Tennessee and that "a sale or transfer of possession as defined in T.C.A. § 67-3002(b) was completed at this point within the State." *Id*. at 505. Under these facts, the Court held that ". . . a taxable event occurred and no exemption exists under the Commerce Clause of the United States Constitution or clause one or clause two of T.C.A. § 67-3007." *Id*.; *accord* **LeTourneau Sales & Service, Inc. v. Olsen**, 691 S.W.2d 531 (Tenn. 1985) (distinguishing **Beecham Laboratories** and **Young Sales** because "[t]hey involved the imposition of a use tax on items merely held in the state for export to other states. No taxable service was performed on the goods while they were held in Tennessee;" and distinguishing **Service Merchandise** because, in that case, "[g]oods were continuously in transit in interstate commerce and never 'came to rest' in Tennessee." In **LeTourneau**, the Court held that the goods at issue "came to rest in Tennessee where a taxable service was performed and taxed as service. The goods here were out of the stream of commerce.").

Check Printers cites the case of **Jack Daniel Distillery, Lem Motlow, Prop. v. Jackson**, 740 S.W.2d 413 (Tenn. 1987), in support of its arguments. In **Jack Daniel**, the taxpayer instructed its subsidiary to purchase advertising materials from sources located outside Tennessee. These materials were then delivered to the taxpayer's Tennessee warehouse, where they were stored and ultimately shipped to destinations outside

Tennessee. *Id*. at 415. Although title to the advertising materials passed from the subsidiary to the taxpayer on delivery of the materials to the Tennessee location, the taxpayer argued, as does Check Printers, that the "sale" was nonetheless exempt under the plain language of the Tennessee Code Annotated section 67-6-313(a). *Id*. at 416. The Tennessee Supreme Court disagreed and held that the import-for-export exemption did not apply because title to the goods transferred to the taxpayer in Tennessee, even though the goods were later exported to destinations outside the State. In so holding, the Court explained that "[t]he import-for-export exemption from sales tax does not apply when the transfer of title is from a vendor located in Tennessee to a purchaser also located in Tennessee even though the purchaser intends to and does export the merchandise." *Id*. The Court distinguished the *Jack Daniel* case from *Beecham Laboratories* and *Young Sales* explaining that

> in neither of those cases was there an allegation that a sale or transfer of possession to a buyer took place in Tennessee. That is not the situation in this case. Here, appellant purchased the Jack Daniel P.O.P. advertising materials from its subsidiary, "new Jack Daniel," in accordance with the agreement attached to the stipulations. Under the agreement, a sale of the merchandise was effected and title passed from "new Jack Daniel" to the appellant upon delivery of the merchandise at a location selected by appellant. The location selected was in Tennessee, making the sale subject to the Tennessee sales tax.

*Jack Daniel*, 740 S.W.2d at 417.

In *Hearthstone*, the taxpayer sold log-home kits that the taxpayer or a subcontractor built on the customer's foundation ("erected homes"). *Hearthstone*, 809 S.W.2d 888. The taxpayer manufactured the log-home kits in Tennessee, but title passed to the taxpayer's customers on delivery of the kit to the job site. *Id*. at 890. Under these facts, the Tennessee Supreme Court held that kits sold to out-of-state customers were manufactured in Tennessee for export and were, thus, exempt from taxation under Tennessee Code Annotated section 67-6-313(a). *Id*. at 890-91. The Court explained that

> [i]n *Nasco, Inc. v. Jackson*, 748 S.W.2d 193 (Tenn.1988), we held that this statute does not create an exemption from taxation for personal property exported for the taxpayer's use in another state. But we have never held that Tenn. Code Ann. § 67-6-313(a) creates no exemption **for personal property exported for resale**, because to do so would render that statute meaningless.

*Hearthstone*, 809 S.W.2d at 890. (Emphasis added). Accordingly, the taxpayer's sales of erected homes to out-of-state customers, i.e., kits manufactured in Tennessee for sale in another state, were not subject to Tennessee sales or use tax. *Id.* at 891-92.

- 16 -

Likewise, in the case of ***Eusco, Inc. v. Huddleston***, 835 S.W.2d 576 (Tenn. 1992), the taxpayer manufactured utility trucks in Tennessee for out-of-state utility companies. An employee of the taxpayer delivered the utility trucks to the out-of-state purchasers. The Tennessee Supreme Court held that the manufactured for export exemption applied under these circumstances, to-wit:

> Since (1) Eusco is a manufacturer of utility trucks, (2) the trucks at issue in this case were manufactured under contracts with out-of-state utility companies, and (3) **title to the trucks passed from Eusco to the utility companies outside of Tennessee**, we conclude that the nine "drop shipment" sales fall within the "manufactured for export" exemption of Tenn. Code Ann. § 67-6-313(a). *See **Jack Daniel Distillery v. Jackson***, 740 S.W.2d 413, 416 (Tenn. 1987).

***Eusco***, 835 S.W.2d at 582 (emphasis added).

From the foregoing line of cases, it is clear that where there was an intervening taxable event in Tennessee (either after the tangible personal property was imported into the State or before property manufactured in Tennessee was exported from the State), Tennessee courts have held consistently that section 67-6-313(a) does not prohibit the Department from taxing the transaction. On the other hand, Tennessee courts have been consistent in holding that section 67-6-313(a) prohibits the Department from levying tax where no such intervening taxable event occurred in Tennessee. As the Tennessee Supreme Court explained in ***Hearthstone***, the manufactured-for-export exemption applies when tangible personal property is manufactured in Tennessee and "exported for **resale**" in another state. 809 S.W.2d at 891 (emphasis added). Conversely, when the tangible personal property is sold here, i.e., title transfers in Tennessee by operation of contract or otherwise, such sale constitutes a taxable event in Tennessee.

Although the cases discussed above clearly indicate that a sale in Tennessee is a taxable event, Check Printers maintains that the trial court erred in not extending its analysis to the question of whether "otherwise taxable sales fit within an exemption to Tennessee's sales tax." As discussed above, the crux of Check Printers' argument is that, regardless of whether the sale or transfer of title occurred in Tennessee, Tennessee Code Annotated section 67-6-313(a) creates an exemption where the two statutory criteria are satisfied, i.e., the disputed product was manufactured in Tennessee and then exported. As stated in Check Printers' brief:

> Here, there is no dispute that title to the printed products at issue transferred from Check Printers to its customers in Tennessee. As a result, Check Printers "sold" the printed products in Tennessee, and the statutes presumptively imposing Tennessee sales tax apply to those sales. *See* Tenn. Code Ann. §§ 67-6-102(78)(A), -201(1), -202(a) . . . . But that

conclusion, alone, does not end the inquiry.

Under the applicable two-step analysis [(which Check Printers derives from *Nashville Golf & Athletic Club v. Huddleston*, 837 S.W.2d 49 (Tenn. 1992), discussed *infra*)], the next inquiry, and the question that controls this case, is whether Check Printers' otherwise taxable sales fit within an exemption to the Tennessee's sales tax. On the undisputed facts of this case, it is clear that an exemption did apply to prevent tax from being imposed on those sales. Because Check Printers manufactured and immediately shipped the products outside Tennessee, the manufactured-for-export exemption applied to exempt those otherwise taxable sales. The Chancellor's decision to the contrary was in error and should be reversed.

Check Printers' argument that section 67-6-313(a) provides an exemption from taxation for tangible personal property manufactured in Tennessee for export even when **title** to the property transfers in Tennessee is not supported by the case law in this State. Specifically, Check Printers' proposition fails to consider the definition of a "sale" in Tennessee. As set out in context above, Tennessee Code Annotated section 67-6-102(80)(A), "'Sale' means any transfer of title or possession, or both . . . ." Because the definition of "sale" includes a transfer of title **or** a transfer of possession, Check Printers' argument is without merit. The transfer of title constitutes a taxable "sale" in Tennessee. As in *Board of Publication*, *LeTourneau*, and *Jack Daniels*, after Check Printers manufactured the disputed products, but before it placed the products into the stream of commerce for export, i.e., before the products "actually start[ed] in the course of transportation from one state to another," *Serv. Merch.*, 529 S.W.2d at 218 (quotation omitted), under Check Printers' contract, there was an intervening taxable event in Tennessee, i.e., a "sale" by transfer of "title" to the customer in Tennessee.

Nonetheless, Check Printers maintains that the trial court erred in failing to determine whether an "otherwise taxable sales fit within an exemption to Tennessee's sales tax" and that Tennessee Code Annotated section 67-6-313(a) provides such an exemption. In addition to being contrary to the foregoing line of cases, Check Printers' argument is also contrary to the legislative intent in enacting Tennessee Code Annotated section 67-6-313(a). Check Printers' argument appears to be based largely on the fact that the legislature placed Tennessee Code Annotated section 67-6-313(a) in Part 3 of the Act, which part is styled "exemptions." However, under the rules of statutory construction, the mere placement of a statute in the Code is not dispositive of legislative intent. Tenn. Code Ann. § 1-3-109 ("Headings to sections in this code and the references at the end of such sections giving the source or history of the respective sections shall not be construed as part of the law."); *State v. Frazier*, 558 S.W.3d 145, 154 (Tenn. 2018) ("We cannot logically view the statute's location in the Code as more indicative of legislative intent than the statutory language."). We further note that the language of Tennessee Code Annotated section 67-6-313(a) predates the division of the Act into

parts. As correctly noted by the Appellee in its brief,

> The 1947 Public Act establishing the sales and use taxes provided: "It is not the intention of this chapter to levy a tax upon articles of tangible personal property imported into this State or produced or manufactured in this State for export; nor is it the intention of this Act to levy a tax on bona fide interstate commerce." 1947 Tenn. Pub. Acts, ch. 3 §4.

As succinctly stated by the Tennessee Supreme Court in *LeTourneau*, "the sole purpose of T.C.A. § 67-6-313 is to confine the sales and use tax to those subjects which the state is permitted to tax under the commerce clause of the United States Constitution." 691 S.W.2d at 534 (citations omitted). The legislative intent, dating back to the original enactment of section 67-6-313, is to impose taxes to the fullest extent allowed by the Commerce Clause. As such, section 67-6-313(a) excludes from taxation only those subjects that the Commerce Clause prohibits the state from taxing. Contrary to Check Printers' argument, section 67-6-313(a) does not create an exemption for property that is otherwise taxable.

Nonetheless, in support of its argument, Check Printers cites the case of *Nashville Golf & Athletic Club v. Huddleston*, which involved the imposition of sales tax on membership dues, under Tennessee Code Annotated section 67-6-212(a)(1), and the exemption from tax for membership assessments for capital improvements under Tennessee Code Annotated section 67-6-330(a)(14). 837 S.W.2d at 50. After concluding that initiation deposits paid by the taxpayer's members were taxable membership dues, the Tennessee Supreme Court went on to address whether the initiation deposits were, nonetheless, exempt assessments for capital improvements under section 67-6-330(a)(14). *Id*. at 54. The flaw in Check Printers' reliance on *Nashville Golf* is that, unlike section 67-6-313(a) (which is the statute at issue here), section 67-6-330(a)(14) (which was at issue in *Nashville Golf*), is written as an exemption, i.e., "There is exempt from the sales tax on admission, dues or fees imposed by § 67-6-212 . . . membership assessments for capital improvements made by recreation club, community service organization or country club against its members." Tenn. Code Ann. § 67-6-330(a)(14)(1989). The legislature uses no such language in section 67-6-313(a). Accordingly, the two-step analysis Check Printers urges is unnecessary. Based on the foregoing analysis, there is only one dispositive question concerning whether the disputed products are taxable in Tennessee, and that is was there a sale in Tennessee before the products were exported to another state. Here, for the reasons discussed above, the answer is yes, with the exception of the AMI blow-in cards, *see* discussion *infra*.

### C. AMI Blow-in Cards

Based on the foregoing analysis, if title to the AMI blow-in cards transferred to Check Printers' customers at the time the cards was tendered for shipping, then there was

a taxable event in Tennessee. It is undisputed that all of the products, with the exception of the AMI blow-in cards, were sold under R. R. Donnelley's standard contract, which transfers title at the time of shipping. However, as to Check Printers' dealings with AMI, there is a dispute of fact as to whether Check Printers and AMI used Check Printers' standard contract language in the sale of the AMI blow-in cards during the Audit Period.

In its response to Check Printers' statement of undisputed material facts, the Department stated, in relevant part:

> 69. For blow-in cards AMI purchased from Check Printers, title and risk of loss did not pass to AMI until the fully printed and bound magazines were shipped from an R.R. Donnelley location outside of Tennessee.
> **REPONSE:**
> **Disputed**. The standard contract terms used by RR Donnelley and its affiliates, including [Check Printers], provide as follows with respect to title and risk of loss:
>
>> Title to and risk of loss for finished and semi-finished work shall pass to Customer upon the earlier of RR Donnelley's delivery to carrier or USPS f.o.b. RR Donnelley plant of final manufacture, or delivery into storage, regardless of whether the transport medium or storage facilities are owned and/or operated by RR Donnelley and regardless of whether RR Donnelley charges Customer for storage.
>
> . . . . Because the blow-in cards were fully manufactured at [Check Printers'] Antioch facility in Antioch, Tennessee, that facility is the "plant of final manufacture" and Tennessee is the state where title passed to AMI pursuant to contract.

In support of its response, the Department relied on the deposition testimony of Cynthia Wilkerson, the Vice President of Operations for R.R. Donnelley and former (during the Audit Period) Vice President of Operations for Check Printers at its Antioch facility. Specifically, the Department cites pages 61-62 of Ms. Wilkerson's deposition, which state:

> Q. . . . Check Printers' shipping and contractual terms vary, but a number of contracts include language such as, quote, title and risk of loss will pass upon mailing or other delivery for shipment. Was that typical language in Check Printers' contracts?
>
> A. I would need to look at the individual contracts to reference.

Q. . . . For contracts that were fulfilled by Check Printers here at the Antioch facility, do you know if Check Printers used RR Donnelley's standard [contract] terms?

A. Yes. I don't know exactly what month, what date, you know, what year, but with the acquisition of RR Donnelley to Check Printers.

However, contracts can be evergreen contracts [Ms. Wilkerson later explained that an "evergreen contract" is one that the parties "can continue without a formal contract renegotiation, unless a customer or printer wants to opt out."]. You would just want to go back to the individual contracts. I guess is what I'm getting at, to see what language. Where we had new contracts where RR Donnelley owned Check Printers, we had specific language.

The Department also cited the report from the Check Printers' audit, which report was prepared by Charles Wright, a "Tax Auditor 5" with the Department. Mr. Wright's report states, in relevant part:

Taxpayer provided a contract and various statements of work for these customers. During our discussions with the taxpayer, the taxpayer has consistently said that title passes at final point of manufacture for all sales.

\*\*\*

Auditors asked for contracts for the sales to these customers. The taxpayer has stated that no more contracts/statements of work, other than the ones provided [i.e., RR Donnelley's standard contract, discussed *supra*] will be provided. Since the taxpayer has consistently stated that all sales are FOB origin, contracts would be necessary to determine where title passed. While discussing where title passed, the auditors were given the following email:

[email from Phillip J. Will, Director of Finance for R. R. Donnelley, stating, relevant part, that, under the two R. R. Donnelley contract templates, i.e., the "short form contract," and the "MSA," "title to and risk of loss for finished and semi-finished work shall pass to Customer upon the earlier of RR Donnelley's delivery to carrier or [USPS]." Mr. Will's email continues: "A good majority of the time we use customer agreement templates and, as you can imagine, this is not a clause that we typically find in a customer provided agreement, so we try to be cognizant of inserting some form of this language."].

The contract between Check Printers and AMI regarding the sale of blow-in cards

is not in the appellate record. However, in its response to the Department's statement of undisputed material facts, Check Printers averred that it did not use the standard contract language in its dealings with AMI, to-wit:

13. [Check Printers'] contracts with its customers that were in effect during the Audit period generally provided that title and risk of loss to printed materials sold by [Check Printers] to its customers were transferred to [Check Printers'] customers upon [Check Printers'] delivery of the printed materials to an onsite United States Postal Service facility or a common carrier for shipment to [Check Printers'] customer's designated ship-to location.

**RESPONSE:** Undisputed for purposes of summary judgment. [Check Printers] further states, however, that there was an exception to Check Printers' typical business practice regarding transfer of title with regard to its sales of "blow-in cards" to American Media Incorporated ("AMI"). For the blow-in cards Check Printers sold to AMI, title and risk of loss did not pass to AMI until the fully printed and bound magazines into which the blow-in cards were inserted and incorporated were shipped from an R.R. Donnelley location outside Tennessee.

In support of its response, Check Printers cited Ms. Wilkerson's affidavit, wherein she stated, in relevant part:

30. . . . For blow-in cards Check Printers sold to AMI, title and risk of loss did not pass to AMI until the fully printed and bound magazines were shipped from the R.R. Donnelley facilities located outside of the state [of Tennessee].

As discussed above, "to survive summary judgment, the nonmoving party 'may not rest upon the mere allegations or denials of [its] pleading,' but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, 'set forth specific facts' at the summary judgment stage 'showing that there is a genuine issue for trial." *Rye*, 477 S.W.3d at 265 (quoting Tenn. R. Civ. P. 56.06). Submission of the foregoing evidence by Check Printers satisfied this requirement and demonstrated the "existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." *Id*. Ms. Wilkerson's affidavit creates a dispute of fact as to whether Check Printers used its standard contract language, i.e., that title and risk of loss passed to the customer at the time the blow-in cards were tendered for shipping in Tennessee (*see* discussion *supra*). Until this dispute of fact is resolved, summary judgment, concerning the AMI blow-in cards, is premature. *Id.*; *accord* **EVCO,** 528 S.W.2d 24-25.

## V. Conclusion

For the foregoing reasons, we vacate the portion of the trial court's order allowing the Department to impose sales tax on the AMI blow-in cards. The trial court's order is otherwise affirmed, and the case is remanded for such other proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Check Printers, Inc., for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE